AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of Indiana

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| RYAN FLY | ) | Case No. |
| | ) | 2:20 MJ 108 |
| | ) | |
| | ) | |
| | ) | **UNDER SEAL** |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __June 17, 2020 thru July 08, 2020__ in the county of __La Porte__ in the __Northern__ District of __Indiana__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 641 | Theft of Public Money, Property, or Records |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Patrica Fuller, Special Agent - FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements
of Fed. R. Crim. P. 4.1, by verbatim email and telephonic conference.

Date: __07/08/2020__

/s/Joshua P. Kolar
*Judge's signature*

City and state: __Hammond, IN__

Joshua P. Kolar, U.S. Magistrate Judge
*Printed name and title*

I, Patricia M. Fuller, after being duly sworn, depose and state:

1.  I have been employed as a Special Agent with the FBI since January 2018 and am currently assigned to the Merrillville Resident Agency of the FBI IP Division. Since 2018, I have been assigned to the IP Public Corruption Task Force (IPPCTF), a unit comprised of state, county, and local law enforcement officers in and around Northwest Indiana, which investigates corruption of public officials in all branches of government. While working with the IPPCTF, I have gained experience investigations into various levels of public corruption as well as other investigations. Prior to this, I was a local police officer in Ohio for 3 ½ years, and in Kentucky for 2 years. Since becoming a law enforcement officer, I have received training and experience in interview and interrogation techniques, arrest procedures, search and seizure, narcotics, white-collar crime, search warrant applications, and various other crimes. Based on this training and experience, I have become familiar with the methods and techniques used by public officials and others who commit crimes in office. Moreover, I am a federal law enforcement officer who is engaged in enforcing criminal laws and I am authorized by the Attorney General to request a criminal complaint and arrest warrant.

2.   I, Special Agent Patricia M. Fuller of the Federal Bureau of Investigation, a Division of the United States Department of Justice located in Washington D.C., assigned to the Indianapolis IN Division, in the Merrillville Residential Agency of the FBI, having been duly sworn; make the following statement in support of a request for a criminal complaint and arrest warrant.

3.   This Affidavit is intended to show only there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  The Affiant's probable cause includes information known to me and/or provided to me by other federal, state, and/or local law enforcement officers.  I am aware of the facts contained in this affidavit because I am the primary case agent in this investigation.

4.   This investigation concerns an alleged violation of Title 18 U.S.C. Section 641, Theft of Government Property.  In September and October of 2019, the FBI received written complaints that an Indiana State Court Judge in the Northern District of Indiana (Judge A), was allegedly taking cash bribes in order to reduce bonds or sentences for current inmates or defendants who appeared in Judge A's courtroom.  These letters also indicated that the bribes were being facilitated by a "middleman" named Ryan Fly (FLY).

2

5. FBI spoke with several sources of information who corroborated the information from the letters. A confidential source (CS1) advised that FLY would get money from family members of arrestees and call JUDGE A to set up a deal. FLY would give some of the cash to JUDGE A, and in exchange, JUDGE A would lower or drop the bond of the arrestee altogether. While listening to the County Jail's phone calls, a local law enforcement officer reported to the FBI that in at least two calls, people mentioned FLY's name in connection with their own cases. The callers mentioned having to have someone "give Ryan some bread" to help with their case. An FBI source, who is a law enforcement officer, sent the FBI a copy of a jail call in which an incarcerated subject talked about paying FLY off to get out of jail.

6. This same law enforcement office confirmed that FLY was often at the courthouse and most often within JUDGE A's Courtroom. A second confidential informant (CS2) admitted to law enforcement that he had paid FLY cash to help a relative who wanted to get out of the County Jail and into a rehabilitation facility. This change would have to be authorized by Judge A. Your Affiant verified with court records that after the date of the payment alleged by CS2, CS2's relative was moved by Judge A to a rehabilitation.

7. The FBI noted that there were multiple phone contacts between FLY and JUDGE A during the time period that these allegations were alleged to have taken place. The contacts between the two tended to support the

3

statements of the informants.

8.     In approximately November and December 2019, the FBI tasked CS2 to make a series of recorded phone calls as well as set a meeting up with FLY to discuss a possible bribe. CS2 met with FLY in FLY's truck. CS2 audio and video recorded the meeting. During this meeting, FLY told CS2 he could help CS2's brother with his case. The following is an excerpt from that recording:

> *FLY: I could ask [Judge A] to take the brace off. Say he in a locked facility he can't go nowhere so he can't afford to pay. Take that off. I can ask him to do that.*
>
> *CS2: Mhhhm.*
>
> *FLY: See what he say about that. I can do that. And then uh, when we go back to court, and I come into court and then we'll see can we get him out.*
>
> *CS2: Okay.*
>
> *FLY: Yep. But Imma need some more money.*

9.     Law enforcement's next step was to utilize an undercover FBI agent (UA) to make a payment to FLY to seek preferential treatment to CS2's brother in JUDGE A's court. This interaction was video and audio recorded. During this meeting between the UA and FLY, the UA paid Fly $600 of United States buy money, in exchange for Fly to influence Judge A to issue a favorable sentencing modification action in CS2's pending case. The following are excerpts from FLY's meeting with the UA:

4

UA: *Ya'll, ya'll know how to, how that works. You, you and the judge got that.*

FLY: *Yea.*

UA: *I just need you to get –*

FLY: *What well well, what I'm gonna suggest to him, that's what I'm saying, I want to know exactly what do ya'll want me try to go for work release or do you want me to try to go home finally with the brace on that way he can work at home?*

UA: *Oh that would be good too.*

FLY: *Well Imma try both of em.*

UA: *That would be even better.*

FLY: *Imma try to work release. Well first I'm gonna try the home, I'm gonna talk about the home with the brace and go to work like that, if not then Imma try the work release*

UA: *Yea. I was tryin to look out for fam.*

FLY: *What (UI)?*

UA: *Um, help them out. So, I got three for you and three for um, the judge.* **[At this point, the video shows the UA handing FLY US currency]**

FLY: *Okay.*

UA: *Is that good?*

FLY: *You can't, yea you can't pay the judge. I mean I, yea we don't call it –*

UA: *Well whatever, you know.*

FLY: *That's all we gotta do. I'm gonna mention it to him, I'm coming to court too.*

UA: *Okay.*

FLY: *I'm coming to court. He got his (UI) judge and he got a lawyer, right?*

UA: *Yea I think so.*

FLY: *I want his lawyer to mention it too.*

UA: *Okay.*

FLY: *You know so me, me and his lawyer and my guy will be on the same page.*

UA: *Okay.*

5

> *FLY: You feel me?*
>
> *UA: Okay. Will you see your guy before next week?*
>
> *FLY: I was just in there just five minutes ago.*
>
> *UA: Oh alright.*
>
> *FLY: I talk to him every day.*
>
> *UA: Oh –*
>
> *FLY: He's a good friend of mine.*
>
> *UA: Oh that's good.*
>
> *FLY: I got a whole bunch of judge friends.*

10. Later on that same day, FLY began to send text messages to the UA backing out of the arrangement claiming that the money was a donation and that he could not directly influence cases. This led the FBI to believe that FLY grew concerned about the interaction and was attempting to cover up the scheme. The following excerpts are from text messages between the UA's phone and FLY:

> *FLY -I want to let you know I run a mentor program in are all money that I receive is a donation to my program*
>
> *FLY -I work with lawyers in the lawyers work with the judges*
>
> *UA -wtf I thought you were gonna help us out for real*
>
> *UA -why I drive all the way there for your mentorship, that's not what we paid.*
>
> *FLY -I don't understand*
>
> *UA -What u not understand? I gave you 6 and now you can't do shit?*
>
> *FLY - I do not pay no judge I don't have no just like that I work with the lawyer, and I take donations.*
>
> *FLY -I program is corner to corner store metro technical training program.*
>
> *FLY -I work with ex-felons*

6

*FLY -I don't do nothing illegal*

11. FLY then sent text messages to the UA's phone saying he would return money. However, he refused to talk on the phone with the UA and instead had an unknown male call the UA to try to meet up and return the money. By that time, the UA had already returned to California and agents did not want to risk exposing the case by meeting the unknown male without an additional UA to accept the money back. The UA advised the unknown male that she would set something up with FLY the following week to recoup the money.

12. During the next several weeks, the FBI tried several times texting with the UA's phone to set up a meeting with FLY to get the money back. In some instances, FLY would not respond, at other times FLY was very vague and would not make any concrete plans to meet a UA. FLY never returned the money nor attempted to reach out to the UA or anyone else to return it. Since February 13, 2020, FLY has not had any further communication with the UA's phone.

13. On June 17, 2020, Fly was asked by local authorities to come voluntarily to the Michigan City Police Department located in LaPorte County, Michigan City, Indiana. Fly agreed to do so. After arriving at the Michigan Police Department and speaking with local authorities, Fly was asked by FBI agents if he would voluntarily speak with them. Fly agreed to

7

do so. Fly was told that he was not under arrest and that he was free to leave at any time.

14. During this meeting, agents confronted FLY with the video evidence of FLY accepting the $600 cash from the UA. FLY was informed that he had accepted government property in the form of the cash. FLY was given the opportunity to cooperate with the FBI's investigation, but declined. After being informed the $600 Fly obtained from the undercover agent was United States buy money and that he could not retain these government funds, Fly made no attempt to return the money and continues to currently retain these government funds as of today's date.

15. Additionally, a review of County Court records revealed that CS2's brother did not receive any benefit from Judge A as promised by Fly.

16. At all times material to this complaint, Fly had a pending civil case pending before Judge A.

Respectfully submitted,

Patricia M. Fuller, Special Agent
Federal Bureau of Investigation

8

This complaint, affidavit, and accompanying warrant, have been transmitted to me electronically and the affiant has verbally attested to the truth and accuracy of the contents via telephone this 8th day of July 2020.

/s/Joshua P. Kolar
_____
JOSHUA P. KOLAR
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF INDIANA